**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CARRIE SKAINS**<br>　　*Plaintiff,* | §<br>§<br>§<br>§ | |
| **v.** | §<br>§ | **CIVIL ACTION NO. 4:24-cv-1272-O** |
| **TRINITY VALLEY SCHOOL**<br>　　*Defendant.* | §<br>§<br>§ | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Carrie Skains files this First Amended Complaint against Trinity Valley School ("TVS"), Defendant herein. Plaintiff would respectfully show the Court the following:

**I. THE PARTIES**

1.　　Plaintiff Carrie Skains is a Texas citizen residing in Tarrant County, Texas. She brings this case against her former employer – TVS – for whom she worked as its HR Director from January 2012 until January 2025.

2.　　Defendant TVS is a Domestic Nonprofit Corporation organized under the laws of the State of Texas, which has already been served and answered. No additional service is requested.

**II. JURISDICTION AND VENUE**

3.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., plus pendent jurisdiction over Plaintiff's Texas causes of action for discrimination and retaliation under Texas Labor Code Chapter 21, and defamation.

4.　　Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as all or a substantial part of the events giving rise to Plaintiff's claims arose in this district.

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT**　　　　　　　　　　　　　　　　**PAGE 1**

### III. <u>FACTUAL BACKGROUND</u>

5.      TVS is an elite private school in Fort Worth, Texas, with roughly 300 employees and an enrollment of approximately 1,000 students. TVS employed Plaintiff Carrie Skains as its Human Resources Director from 2012 until January 6, 2025. As Human Resources Director, Ms. Skains served as a member of TVS's Administrative Leadership Team, which also included TVS's Head of School, its Chief Financial Officer ("CFO"), and other administrative heads. All Leadership Team members reported directly to the Head of School.

6.      During most of Ms. Skains' employment, TVS's Head of School was Blair Lowry, who referred to Ms. Skains as the best HR person she'd ever worked with. On numerous occasions Lowry referred to Ms. Skains as "amazing."

7.      TVS's Operations Committee was a subcommittee of the Leadership Team. Members of the Operations Committee included Ms. Skains as Human Resources Director, the CFO, Director of Facilities, Director of Technology and Innovation, Director of Security, and Director of Advancement and Strategic Initiatives.

8.      At all times during her thirteen (13) year tenure, Ms. Skains served TVS, its students and their parents faithfully, receiving multiple raises and producing an exemplary record. She was never disciplined, never written up or negatively counseled, nor did she receive oral or written complaints about her performance, attitude or contribution to the school.

9.      In August 2022, TVS hired a new CFO named Adam Wojtelwicz, and things soon changed for Ms. Skains and other women at TVS.

10.      On February 16, 2023, at a bi-weekly meeting of the Operations Committee, CFO Adam Wojtelwicz ("Wojtelwicz"), in a loud, aggressive manner, subjected Ms. Skains to a constant barrage of questioning regarding TVS's policies and procedures – in front of the other

Operations Committee members. While *all* of Wojtelwicz's questions directed at Ms. Skains during this exchange were highly combative, *some* of his questions were completely outside of Ms. Skains' scope of work as Human Resources Director. Wojtelwicz's treatment of Ms. Skains was so severe that it visibly upset her and brought her to tears in front of the other members of the Committee.

11.     TVS's Employee Handbook expressly provides:

The School expects employees to conduct themselves in a businesslike and professional manner. Employees are expected to ensure that the School's services are provided and administered in a manner consistent with the School's standards of conduct. Examples of such conduct include, but are not limited to:
…
- Treating fellow employees, students, parents, visitors, and others in a professional, courteous, and respectful manner; and,

- Refraining from behavior or conduct deemed offensive or undesirable, or which is subject to disciplinary action.

12.     Wojtelwicz violated this policy with female employees of TVS, but not with men. At other meetings, other female employees were also berated by Wojtelwicz to the same degree as Ms. Skains, but no men were subjected to the same harassing and aggressive treatment. Eventually it became known that some female members of the Leadership Team would not even meet with Wojtelwicz alone.

**Skains' Internal Report of Sex Discrimination:**

13.     That same day – February 16, 2023 – Ms. Skains reported to the Head of School, Blair Lowry, the events of the Operations Committee meeting earlier that day and the harassing treatment she had received from Wojtelwicz. Lowry and Ms. Skains were both aware of a prior complaint of similar behavior by Wojtelwicz toward Julie Knudson, who had reported it to her supervisor Jeff Snyder, TVS's Assistant Head of School. Ms. Lowry told Ms. Skains she would

speak to Wojtelwicz about the incident, and Lowry promised ultimately either she or the assistant head of school would attend Operations Committee meetings where Wojtelwicz was to be present.

**Wojtelwicz's Retaliation:**

14. After Ms. Skains made her formal internal complaint to Ms. Lowry, and despite the fact that both Ms. Skains and Wojtelwicz reported directly to the Head of School, over the next fifteen (15) months or more Wojtelwicz began shifting a substantial amount of work to Ms. Skains that were not in TVS's written job description for HR Director, and which for the previous ten (10) years had always been outside of Ms. Skains' scope of work. Most of those had always been CFO's (or previous CFOs') responsibility.

15. On March 23, 2023, during an Operational Committee meeting, which neither the Head of School nor her assistant were able to attend, Wojtelwicz kept insisting to Ms. Skains that the School use a search firm and search committee to fill the Director of Security Position. Ms. Skains told Wojtelwicz that she had already spoken with the Head of School about this matter and was told that the School had already received a number of highly qualified applicants via its Applicant Tracking System. Ms. Skains told him then that the decision was up to the Head of School who had said no to the search firm. Wojtelwicz continued to insist repeatedly that a search firm be used, but he then stated he would stop because he "did not want to upset Ms. Skains." Given the timeline of events and Wojtelwicz's recently aggressive behavior toward Skains, any reasonable person would have seen Wojtelwicz's comment about "not wanting to upset Ms. Skains" as mocking (because his previous behavior had been so severe as to make her cry in front of other Leadership Team members) and retaliatory by Wojtelwicz (because Ms. Skains had previously reported his abusive behavior toward her to the Head of School, who had agreed to talk to him about it).

16.     For example, on September 1, 2023, Wojtelwicz sent an email to the entire leadership team with the subject line: "Important Index Data." The email acknowledged this was a job responsibility of prior CFO's but claimed it was not realistic for Wojtelwicz to try to find 80 pages worth of data points on his own. Of the pages he assigned out of his area of responsibility 43% went to Ms. Skains to perform – more than any other person. This attributed to Ms. Skains more than 40 hours of additional work without regard to Ms. Skains' other job responsibilities, and despite the fact that Wojtelwicz's compensation was 250% of Ms. Skains' pay.

17.     Moreover, in the summer before the 2023-2024 school year started, TVS's Athletic Director departed. TVS asked two current employees in the Athletic department to act as Interim Athletic Directors. Both were male and were provided extra compensation for the 2023-2024 school year, due to their extra duties. Ms. Skains, in contrast, was told by Wojtelwicz she would need to manage and was now responsible for the Athletics stipend budget and issuance of all Athletic personnel contracts – something she had previously never been responsible for and despite her other duties.

18.     Ms. Skains was also forced to take on the hiring of all part time coaches, and performance management of the full time Athletic employees. This required approximately 12 hours per week of additional work time.

19.     Wojtelwicz also added to Ms. Skains' workload the chore of building out payroll reconciliation sheets, which had never previously been Ms. Skains' responsibility.

20.     Wojtelwicz also added the tasks of Workers Comp Audit, and GL Code mapping. He tried to add Motor Vehicle Reports for insurance, but Ms. Skains never actually had to perform those duties.

21.     This work-shifting by Wojtelwicz caused Ms. Skains to work sixty (60) hour weeks

(or more) in order to keep up with her increased workload and, because she was a salaried employee, she did not receive additional compensation. Significantly, although Wojtelwicz had been employed by TVS since August 2022, he did not begin increasing Ms. Skains' workload until after she reported his disparate treatment of her and other female employees (violating the professional conduct policy where women were concerned but never men).

22.     Wojtelwicz also threatened Ms. Skains and other female employees with demotion – telling them if they could not keep up, they should allow him to move them into a less demanding role. Several women complained about Wojtelwicz's conduct toward women. No men complained that Wojtelwicz has mistreated them in a similar fashion, although one indicated he had witnessed and noticed Wojtelwicz's mistreatment of women.

**Wojtelwicz's Reward:**

23.     In May 2024, TVS terminated Lowry as Head of School. TVS's incoming President of TVS's Board of Directors admitted to Lowry that Lowry would not have been removed if she had been male, which Lowry repeated to Ms. Skains.

24.     TVS's Employee Handbook claims that TVS is committed to providing a workplace free from discrimination. However, despite Wojtelwicz's disparate treatment of women (by this time reported by at least 3-4 women), TVS's Board appointed him Interim Head of School.

25.     TVS's Employee Handbook expressly provides:

> Employee cooperation and support are expected in order to maintain a working and learning environment free from discrimination. If an employee feels as though he/she has been subjected to any type of discrimination, he/she should report the incident in detail to the Head of School, or the Director of Human Resources within one week of the incident.

Any reasonable person would understand this to mean that if it were the Head of School who was engaging in discriminatory conduct, the employee could report instead to the Director of Human

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT**                                   **PAGE 6**

Resources – i.e., Ms. Skains. But Wojtelwicz used his new position both to shield himself, and to undermine Ms. Skains' ability to do her job – receiving employee complaints of discrimination.

26.     On June 5, 2024, in a Leadership Team meeting, Wojtelwicz stated he was aware that there were employees that took issue with him and, if that was the case, Wojtelwicz indicated those employees needed to state it in front of the entire Leadership Team, or they needed to schedule a meeting with him to discuss the matter. These actions reflected Wojtelwicz's emboldened attitude toward his previous harassment of female employees by hostility and intimidation, as well as making himself the only person employees could complaint *about him*, and significantly hindering Ms. Skains' role in protecting employees.

**<u>Wojtelwicz and TVS's New President are Birds of a Feather:</u>**

27.     The incoming President of the Board was Brant Martin (who had conceded to Lowry she would not have been removed if she were a man before the Board replaced her – not only with a man, but with a man who had a history of treating women poorly). Martin began his own practice of violating TVS's code of professional treatment of employees disparately toward women. Martin intimidated one woman – Sandy McNutt, who had spoken with Martin about the Interim Head of School role. Ms. McNutt had considerably better qualifications than Wojtelwicz, yet not only was Wojtelwicz selected, Martin told McNutt he was getting questions about the Wojtelwicz appointment and demanded McNutt write a letter stating she did not want to be Head of School. Martin also became verbally abusive with many female staff members, and on one occasion called a woman "a complete idiot" to her face. Martin did not treat men in the same fashion.

28.     Speaking at a meeting with all of the School's faculty and staff, Martin vividly described in a crude manner and outright misrepresented actions committed by a former TVS

employee in front of a student. A female student had alleged in April 2023 that the male teacher had returned from the restroom with his pants unzipped, and that she had seen his penis. Instead of referring to this incident truthfully, Martin told a full room of faculty and staff that the male teacher had been "playing with his balls" in front of a young student. While this comment should be offensive to anyone, a reasonable person could conclude it is likely more offensive to women to hear this comment in front of men than for men to hear it in front of women. While this comment by Martin becomes more significant later, but it illustrates that TVS's disrespect of and discriminate treatment of women based on their sex is not limited to Wojtelwicz but actually more pervasive in the administration's culture.

**Skains Reports Sex Discrimination (Herself and Others) and Retaliation to the EEOC:**

29.     On or about June 12, 2024, Ms. Skains timely filed a Charge with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation for having reported it internally. Her statement to the EEOC in support of the Charge included the behavior of both Wojtelwicz and Martin.

30.     In a conversation with Ms. Skains' counsel regarding her June 12, 2024, EEOC Charge, a representative of TVS initially informed Ms. Skains' counsel that TVS would investigate the conduct Ms. Skains had reported. Later, however, the TVS representative informed Ms. Skains' counsel that TVS was now investigating Ms. Skains. Ms. Skains timely filed a new EEOC Charge on September 10, 2024, reporting the investigation of her as retaliation for having filed her June 12, 2024, EEOC Charge alleging sex discrimination and retaliation.

31.     Throughout the time both Charges were pending, Ms. Skains continued to receive no complaints about her performance or her attitude and, just as before, she was never disciplined for anything – completely appropriate given her exemplary performance and track record.

---

**Further Retaliation – TVS Publishes Defamatory Statements to Roughly 6,000 Parents, Faculty and "Friends" of TVS:**

32.     An EEOC mediation was scheduled for 9:00 a.m. on December 19, 2024, ostensibly for TVS to try and resolve Ms. Skains' EEOC Charges. However, on December 18, 2024, roughly sixteen (16) hours before Ms. Skains' mediation was to start, TVS published a roughly six (6) page E-mail titled "Piano Investigation Update," disseminating it widely via E-mail to thousands of individuals (an estimated 6,000 people received it), including parents, alumni, employees, board members, Ms. Skains' professional colleagues and potential future employers, her husband, and her son, as well as countless other persons of unknown identity. TVS's E-mail contained false and defamatory statements about Ms. Skains that constitute libel, libel per se, defamation, and defamation per se under Texas law.

33.     To understand why these highly publicized statements of fact are both false and defamatory toward Ms. Skains, a little additional background is in order. Ms. Skains' job description at TVS provides as follows under Major Job Responsibilities:

- maintains confidentiality of sensitive employee information, establishes processes and procedures to secure and safeguard sensitive employee information including data, investigations or performance or disciplinary actions

As noted above, Ms. Skains at all times reported to the Head of School, who in April 2023 was Blair Lowry.

34.     In its widely disseminated E-mail, TVS disingenuously claims to reveal the results and findings of an allegedly independent investigation, although TVS reveals in the E-mail its Board has altered the information. The E-mail identifies itself as being from most of the 2024-2025 TVS Board members. The E-mail discusses an incident that occurred in April 2023, and falsely accuses Ms. Skains of dishonesty, professional negligence, ethical misconduct, and harming students, all of which inherently damage her professional standing and employability.

35.     The true facts will show that in April 2023, parents of a student taking piano lessons after school reported that her piano teacher returned from the restroom with his pants unzipped, and the child "may have seen something." The parents were reluctant to get the teacher in trouble in case it was an accident. Ms. Skains was called in to meet about the issue with the Assistant Head of School and the teacher himself. The teacher reported he had in fact returned from the restroom with his pants accidentally unzipped. Ms. Skains, the Head of School, Board President Jenny Rosell, and one of TVS's attorneys discussed what action to take. They put the teacher on administrative leave and reported the incident to Child Protective Services and to law enforcement. The Head of School made the decision to terminate the teacher because he knew the incident had happened and had failed to self-report it, which demonstrated bad judgment potentially harmful to students. Child Protective Services dismissed the case and did not move forward, and law enforcement did not charge the teacher (for indecency with a child, nor for anything else).

36.     Apparently, sometime in 2024, roughly five (5) parents alleged their children had had similar experiences with the former teacher while he was still at TVS. TVS then hired T&M USA – an outside consultant – to conduct an investigation, which culminated in a "comprehensive report," which the TVS Board members kept secret. The Board's own "investigative committee" then wrote and released TVS's December 18, 2024, E-mail "summary" of T&M's "findings" – ostensibly for the purpose of providing "transparency and accountability."

37.     Among others, TVS's December 28, 2024, contains the following false and defamatory statements regarding Ms. Skains.

38.     TVS's December 18, 2024, E-mail states:

> **This observation occurred while the child was alone with [Teacher] and was described by the family as [Teacher]'s penis poking out through his pants, which [Teacher] told Assistant Head of School Jeff Snyder and**

**Human Resources Director Carrie Skains was accidental following a trip to the bathroom.**

In fact, neither the family nor the teacher reported in April of 2023 that his "penis was poking out through his pants." Rather, the only information Ms. Skains heard from the initial report was "the possibility" that "a child might have seen something" because, when returning from the restroom, the teacher had failed to zip up and had walked back into the room with the child with his pants unzipped. In his comments earlier in 2024, Brant Martin – the Board President – had already exacerbated the level of exaggerated knowledge Ms. Skains allegedly had by referring to the incident in a June 2024 all-faculty-and-staff meeting as the teacher "playing with his balls" in front of a student. TVS's E-mail and Martin's statement falsely escalated the level of alleged "knowledge" regarding potential indecency that Ms. Skains possessed, which expanded the scope of what TVS's December 18, 2024, E-mail later claims Ms. Skains and others "kept…largely to themselves."

39.     TVS's December 18, 2024, E-mail lumps Ms. Skains in with other school leaders by listing her as present in the meeting, then going on to state:

> **Evidence in T&M's investigation indicates that Ms. Lowry, Ms. Skains, Mr. Snyder and Ms. McNutt, who were aware of the incident, kept the information largely to themselves in the days that followed because they were concerned that sharing it would be detrimental to [Teacher] if the exposure of his penis to the child was indeed accidental.**

Although the E-mail claims to have been based in part on TVS's policies and procedures, the E-mail omits key information from Ms. Skains' job description and TVS's policies and procedures, such as:

    a) Ms. Skains was TVS's Human Resources Director, and TVS's Job Description lists "*maintains confidentiality of sensitive employee*

*information, establishes processes and procedures to secure and safeguard sensitive employee information including data, investigations or performance or disciplinary actions*" as a "Major Job Responsibility;"

b) With regard to Confidentiality of School Information, TVS's Employment Handbook provides:

**CONFIDENTIALITY OF SCHOOL INFORMATION**

"Safeguarding the confidential nature of information concerning the School's transactions, present and prospective students, parents, and suppliers is essential to the conduct of School business. Caution and discretion are required in the use of such information. Share it only with those who have legitimate authority to know.";

c) With regard to reporting violations of school policy, TVS's Employment Handbook provides:

**REPORTING OF POLICY VIOLATIONS**

Employees are expected to promptly report any observed or known violations of any School policy or law to the Head of School, applicable Division Head or supervisor, or Director of Human Resources.

40. The above statement from TVS's E-mail further fails to acknowledge that the Head of School – Ms. Blair – was Ms. Skains' direct supervisor, so once Ms. Skains was aware Ms. Blair already knew about the incident and had reported it to CPS, TVS's policies and procedures did not require Ms. Skains to take further action – everything was in the hands of the Head of School, TVS's lawyer, and CPS. Perhaps most importantly, TVS's Job Description for Ms. Skains made it a "Major Job Component" for Ms. Skains to keep this matter confidential – not simply to protect the teacher, but also to protect TVS from being sued by the teacher for defamation if the allegation against him were determined to have been completely false and Ms. Skains (or others) had failed to keep it confidential as TVS's policies require. Ms. Skains simply did not have the power or authority to decide – one way or the other – to "keep the information largely to herself

---

in the days that followed." By omitting the truth about Ms. Skains' job description and its own internal policies and procedures, TVS's E-mail creates the false impression that Ms. Skains was a decision-maker – she wasn't.

41. TVS's December 18, 2024, E-mail makes the following statement:

> **Other than reviewing the contents of [Teacher]'s employment file and his School-issued laptop, Ms. Lowry, Mr. Snyder, Ms. McNutt and Ms. Skains did not conduct any internal inquiries or take other steps to determine if [Teacher] had engaged in inappropriate interactions with other TVS students.**

Again, the E-mail fails to acknowledge that these decisions were not within Ms. Skains' authority or control.

42. TVS's December 18, 2024, E-mail creates the false impression that Ms. Skains took part in creating "a misleading narrative to parents who asked that [Teacher] 'had to step away' from TVS for the remainder of the School year due to 'personal reasons.'" Although Ms. Skains is not expressly listed in this paragraph, she is not exonerated here either. In truth, Ms. Skains never provided any information – true or false – to any parents or teachers about the April 2023 incident.

43. Because TVS's December 18, 2024, E-mail had already lumped Ms. Skains in with other "school leaders," in several sentences that follow the E-mail creates the following non-exhaustive list of false impressions about Ms. Skains as a "school leader:"

a) that she was "disingenuous in their communications to parents, citing 'personal reasons' as the impetus for the teacher's departure;
b) that her actions or inaction "delayed TVS parents from having vitally important discussions with their children about their experiences with [Teacher];"
c) that her actions or inaction "may have delayed not only justice for families, but also the healing they need;" and
d) that her actions or inaction was "obfuscation" that "undermined the trust

necessary for collaborative and productive relationships with families and fell short of the standards and mission" TVS purports that it upholds. The E-mail omits the fact that Ms. Skains was taking direction from her direct supervisor, Ms. Blair, and TVS's legal counsel – despite the fact that TVS has access to E-mails showing that's exactly what happened.

44.     In truth, Ms. Skains' power and authority were at all times limited by 1) the level of information she was aware of; 2) the confines of her job description; and 3) TVS's policies and procedures. In truth, when the April 2023 incident occurred, Ms. Skains took appropriate and legitimate action and was precluded by TVS's command structure and policies and procedures from doing more.

45.     Further, the evidence will show, and the jury in this case is likely to find, that the real reason Ms. Skains appears in this letter at all and is targeted with these defamatory statements is exactly what she has charged in her EEOC Charges and will plead – namely, that she was retaliated against for participating, in any manner, in the reporting and investigation of discriminatory practices, and for opposing discriminatory practices.

46.     Over the next few days, as TVS very likely intended, a parent text thread begins to blow up, in which numerous parents say things like "they should all be fired," and one parent says "what they did is just as bad as what he did" (comparing Skains' alleged conduct to the teacher who was reportedly indecent with a child).

47.     These false impressions are defamatory and have caused Ms. Skains irreparable harm by humiliating her and so undermining any trust TVS parents had in her that she could no longer be effective in her position. These defamatory statements have also substantially impaired

her ability to pursue her career in her chosen field by securing a position elsewhere.

48.     From the manner and timing of TVS's E-mail's release – so broadly propagated only sixteen (16) hours before Ms. Skains' scheduled EEOC mediation with TVS – a reasonable fact finder could conclude that including Ms. Skains in the E-mail, as well as the description of her role (and the apparently purposeful omission of other significant information regarding her job description at TVS and TVS's policies and procedures), were all forms of retaliation against her for having filed an EEOC Charge against TVS alleging and detailing sex discrimination and a hostile work environment.

49.     TVS made the statements contained in the E-mail with actual knowledge of their falsity, reckless disregard for the truth, or fully aware that including certain facts while omitting others created false impressions about Ms. Skains rather than illuminating the truth. As a result, the E-mail was not only a deliberate attempt to harm Ms. Skains' reputation, but also actually resulted in recipients calling for Ms. Skains' termination on a 75+ parent text thread – some parents falsely comparing the actions TVS alleged against those named in the E-mail (including Ms. Skains) as being equivalent to those of the criminally accused individual (i.e., indecency with a child). TVS's E-mail appears to have been intended to discourage other employees from engaging in legally protected activity under Texas or federal anti-discrimination laws, including Chapter 21 of the Texas Labor Code or Title VII, among others. Certainly, the E-mail would tend to dissuade a reasonable worker from engaging in similar protected activity.

50.     Ms. Skains timely filed an EEOC Charge on December 30, 2024, alleging that her inclusion and portrayal in TVS's December 18, 2024, was retaliation against her for filing her previous EEOC Charges – both reporting and opposing sex discrimination and retaliation.

51.     Finally, The publication of these defamatory statements and impressions evidenced

an intent by TVS never to rectify the additional workload Ms. Skains was carrying without pay, plus they subjected Ms. Skains to such widespread humiliation and unjustified distrust, they rendered Ms. Skains' continued employment impossible and forced her to resign on January 6, 2025, constituting a constructive discharge under Chapter 21 of the Texas Labor Code and Title VII.

52.     On or about January 29, 2025, Ms. Skains timely filed an additional EEOC Charge alleging that her resignation on January 6, 2025, was due to constructive discharge.

## IV. CAUSES OF ACTION

### Count 1 – Sex Discrimination and Retaliation; Title VII:

53.     To the extent necessary, each of the claims set forth below is pleaded in the alternative.

54.     Plaintiff incorporates herein each allegation of Paragraphs 1 through 52.

55.     On or about June 12, 2024, Plaintiff timely filed a charge of discrimination in employment against TVS, an administrative proceeding with the Equal Employment Opportunity Commission ("EEOC"), in which she asserted that she was treated in a disparate and discriminatory manner by TVS due to her sex, was retaliated against by TVS for having reported it internally with TVS, and was subjected to changes in the terms and conditions of her employment, as well as a hostile work environment – all in violation of federal law Title VII of the 1964 Civil Rights Act.

56.     On September 10, 2024, Plaintiff timely filed an additional/supplemental charge of discrimination in employment with the EEOC against TVS for an additional act of retaliation – namely subjecting her to an investigation instead of investigating her claims of sex discrimination and retaliation. Since Plaintiff received her right to sue letter from the EEOC, TVS again retaliated

against her and damaged her reputation by sending an E-mail to several thousand people which wrongfully asserted, in part, that Plaintiff had engaged in covering up indecency with a child. Finally, Defendant TVS's retaliation subjected Plaintiff to humiliation so severe that, when combined with the additional workload she had carried for more than 18 months without compensation, no reasonable employee in Plaintiff's position could have remained employed by TVS.

57.     Title VII prohibits discrimination based on race, color, religion, sex, or national origin. *See* 42 U.S.C. §2000e-2(a)(1). Title VII also prohibits harassment and retaliation by an employer against an employee who opposes an employment practice that violates Title VII. *See* 42 U.S.C. §2000e-3(a).

58.     As set forth above, Plaintiff was discriminated against by one or more male employees and/or agents of Defendant TVS School by their comments and/or actions. Defendant has permitted Plaintiff to be harassed and retaliated against in the form of a hostile work environment, including a substantially increased workload altering the terms and conditions of her employment, defamatory statements damaging her reputation and rendering it impossible for her to perform her job duties, and constructive discharge. Independently and in the alternative, the increased workload and defamatory statements significantly alter the terms and conditions of Plaintiff's employment and constitute discreet actions of retaliation. Still further, each act of retaliation, as well as all acts of retaliation combined, constituted a constructive discharge.

**Count 2 – Sex Discrimination and Retaliation; Texas Labor Code Chapter 21:**

**A) Discrimination Because of Sex:**

59.     Under Texas Labor Code §21.051, an employer commits an unlawful employment practice if because of sex, the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

Tex. Lab. Code §21.051.

### B) Retaliation for Filing Report of Sex Discrimination:

60.    Under Texas Labor Code §21.055, an employer commits an unlawful practice if the employer retaliates or discriminates against a person who opposes a discriminatory practice, including filing an internal report or one or more EEOC Charge of discrimination on the basis of sex.

61.    As set forth above, Plaintiff was discriminated against by one or more male employees and/or agents of Defendant TVS School by their comments and/or actions. Defendant has permitted Plaintiff to be harassed and retaliated against in the form of a hostile work environment, including a substantially increased workload altering the terms and conditions of her employment, defamatory statements damaging her reputation and rendering it impossible for her to perform her job duties, and constructive discharge. Independently and in the alternative, the increased workload and defamatory statements significantly alter the terms and conditions of Plaintiff's employment and constitute discreet actions of retaliation. Still further, each act of retaliation, as well as all acts of retaliation combined, constituted a constructive discharge.

### Count 3 – Texas Common Law Defamation:

62.    Defamation is defined as the invasion of a person's interest in her reputation and good name. Under Texas common law, a plaintiff has a cause of action for defamation when a defendant: 1) published a statement of fact; 2) the statement referred to the plaintiff; 3) the

statement was defamatory; 4) the statement was false (or created a false impression by omitting facts that would have created an accurate impression); 5) with regard to the truth of the statement, the defendant was (a) acting with actual malice; (b) negligent; or (c) strictly liable; and 6) the plaintiff suffered pecuniary injury (unless injury is presumed).

63.     Plaintiff hereby sues for defamation under Texas common law and pleads – all in the alternative – both extrinsic and textual defamation. The textual defamation was both explicit and implicit (or, alternatively, explicit or implicit), and included defamation by whole implication (also known as defamation by "gist") and/or defamation by partial implication. Plaintiff alleges actual malice or, alternatively, negligence or, alternatively, strict liability.

## V. DAMAGES

62.     As set forth above, Plaintiff seeks damages herein, to which she is entitled under Title VII, including all economic or pecuniary losses, including back pay, front pay and loss of benefits, damage to her reputation, mental anguish, nominal damages, punitive damages, attorneys' fees, expert witness fees and court costs.

63.     Under Chapter 21 of the Texas Labor Code, Plaintiff seeks damages in the form of all economic or pecuniary losses, including back pay, front pay and loss of benefits, damage to her reputation, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, punitive damages, attorney's fees, expert witness fees and court costs.

64.     To the extent required, under both Title VII and Chapter 21 of the Texas Labor Code, Plaintiff further pleads for the special damages of the loss of a specific benefit TVS offers, in which TVS would have paid 50% of the cost of Plaintiff's Ph.D., and paid her for full time employment while she pursued it. Plaintiff seeks both the cost TVS would have paid, as well as the value of the lost opportunity.

65. Under Texas common law of defamation, Plaintiff seeks actual damages as well as punitive damages.

66. On all of the foregoing elements of damages, Plaintiff seeks pre- and post-judgment interest to the maximum extent permitted by law.

## VI. ATTORNEYS' FEES AND COSTS

67. In addition to the fees Plaintiff has already paid her previous counsel, Hill Gillstrap, PC, Plaintiff has retained Walter L. Taylor to represent her in connection with this matter. She has entered into a hybrid fee arrangement – partly out of pocket and partly contingent fee. In addition to and without waving and/or limiting any other relief requested in this Complaint, Plaintiff seeks, to the extent permitted by applicable law, including but not limited to 42 U.S.C. Section 2000e-5(K) and Chapter 21 of the Texas Labor Code, her reasonable attorneys' fees, expert witness fees, and costs to be incurred herein, in such amount as the Court finds to be equitable and just.

## VII. JURY DEMAND

68. Pursuant to Rule 38, Federal Rules of Civil Procedure, Plaintiff requests trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer, and that, upon final hearing, Plaintiff recover judgment against Defendant for the relief set forth below:

a. Any and all amounts recoverable and/recognizable as economic or non-economic damages, nominal damages, and punitive damages;

b. Litigation expenses and costs, including but not limited to her reasonable and necessary attorneys' fees and expert witness fees;

c. Pre-judgment and post-judgment interest, at the maximum rate allowed by law; and

d.  Such other and further relief, whether general or special, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

Walter L. Taylor
State Bar No. 19727030
**TAYLOR LAW FIRM**
*taylorlawfirmdfw@gmail.com*
6630 Colleyville Blvd, Suite 100
Colleyville, Texas 76034
Tel: (817) 770-4343
Tel: (512) 474-6600
Fax: (512) 474-6700

**ATTORNEYS FOR PLAINTIFF**
**CARRIE SKAINS**

## CERTIFICATE OF SERVICE

I hereby certify by my signature above that a true and correct copy of the foregoing document has this day been served via certified mail, return receipt requested, electronic service, facsimile or hand delivery in open court, upon the following on this 28th day of March, 2025:

Laura Balhoff Englert, *lenglert@hanover.com*
Stephen Fahey *steve@sfaheylaw.com*

Frank Hill *fhill@hillgilstrap.com*
Stefanie M. Klein *sklein@hillgilstrap.com*
Anne Michels *amichels@hillgilstrap.com*